THE STATE v. LOUIS SPIDLE, Appellant.—116 S. W. (2d) 96.

Division Two, May 3, 1938.

*Walter M. Hilbert* and *Otto P. Shanks* for appellant.

*Roy McKittrick,* Attorney General, and *Frank W. Hays,* Assistant Attorney General, for respondent.

LEEDY, P. J.—Appellant was charged by information in the Circuit Court of Lewis County with having willfully and feloniously killed an animal, to-wit, a 225-pound hog, the property of another, with the felonious intent to steal and convert to his own use the carcass of said hog. Upon a trial he was convicted, and the jury assessed his punishment at a term of two years in the penitentiary, and

from the judgment and sentence imposed in accordance with the verdict, he has appealed.

The facts: Late in the evening on October 24, 1935, Charles O. Tarpein, a farmer living in Lewis County, went about his premises and fed his hogs, twelve in number. One of them, which weighed about 225-pounds, was kept in a shed separate and apart from the others. Returning to the shed before daylight the next morning, Tarpein discovered that the hog was missing. Officers and neighbors were called in, and an investigation disclosed that it had been butchered, and the carcass removed. It should be stated that the evidence showed that one Archie Thrasher had, at the preceding January Term, pleaded guilty to the same offense with which appellant stood charged, and was sentenced to a term in the penitentiary.

Roy Hinton testified that "about 30 minutes before sundown" on October 24, he saw appellant and Archie Thrasher at the home of Roy Thrasher (which was in the vicinity of the Tarpein place) under circumstances as follows: That Roy Thrasher's horses had come to his (Hinton's) place, and he took them home; that while at Roy Thrasher's he saw a "model T little blue roadster" in the yard, and that Archie Thrasher "and another fellow was there in the car. I was standing at the gate there, and he hollered at me and I walked up where Archie was at the car, and there was another fellow in with him." The witness positively identified appellant as the other person in the car.

The evidence showed that there was a pool of blood in the corner of the shed and "fresh blood where something was dragged out of the shed to the east side of the barn." Some fifty yards east of the barn and out in the weeds, the searchers found the head and entrails of the hog which had been shot in the head with a rifle. This place was near a creek. Leading across the creek two sets of bare footprints were found (one set being larger than the other), as well as splotches of blood on the rocky banks where something had been dragged. Across the creek "every little bit you could see blood along the grass and where they went to get through a wire fence there was plenty of blood." Following this trail, which led northeasterly to a road (a distance of more than a quarter of a mile), it was discovered that a car had been driven into the pasture and back out to the road again. One tire of the car had a peculiarly distinctive tread, by means of which the car could be followed.'

The sheriff and his deputy testified that they followed the trail of this car to Roy Thrasher's; that his car was in the yard, but its treads did not correspond to those on the car being trailed. After conferring with Roy Hinton, the officers went at once to Quincy, where they were joined by Parcell and Thiessen of the police force of that place. Arriving there in the early afternoon of that day (October 25th),

they proceeded first to the home of Spidle, where the officers looked to see if there was a car parked. They found none, but interviewed Spidle, who, among other things, denied "he had any relations by the name of Thrasher." The officers then went to an address on Spring Street, where Archie Thrasher lived. There they found a model T Ford roadster with a "light blue body" and tire treads exactly corresponding with those on the car the officers had trailed in Lewis County. In searching the Archie Thrasher home the officers came to a room on the second floor that was locked. Therein they found part of the carcass of a hog—variously described as "about half a hog," "a portion of a hog was lying on this table," "it looked like a ham, a shoulder and some side meat," "it resembled half a hog cut up." Archie Thrasher was taken into custody and removed to the police station, then the officers "went right back to Louis Spidle's home." They were unable to find Spidle on their return, but did discover "a half a hog" in his basement. It was described as follows: "The way it was dressed, it looked like it would be from about a 225-pound hog." "It was in a tub." "There was some of the pig's feet with some red fuzz right down near the end." Although the Quincy officers were constantly on the lookout for appellant, they were unable to apprehend him. However, about two weeks later he was arrested at Hannibal, and in connection with the jail routine of fingerprinting and identifying all prisoners, he gave his name as Jack Smith. Later the same morning, when confronted with a circular which contained his photograph, and requested the apprehension of "Louis Spidle" for Lewis County authorities, he admitted his identity. When asked "what he did that the Lewis County authorities were willing to extradite him from any state, he says, 'I stole a hog.' . . . He said after he got this hog he had to carry it for about a half a mile and then he didn't get to eat it. He made mention that his—I believe it was his uncle was with him at the time."

The evidence introduced on behalf of appellant was brief, and consisted of the following:

(1) An information charging Archie Thrasher with the identical offense for which appellant was then on trial, and the record of the Lewis Circuit Court showing Thrasher's plea of guilty to the charge, and the judgment sentencing him to a term of two years in the penitentiary.

(2) His own denial that he was in the car with Archie Thrasher on the day in question, as testified to by the witness Hinton; and, that he made any statement to the Hannibal police to the effect that he had stolen a hog in Lewis County. (He did admit he told the Hannibal police that his name was Jack Smith, but justified this on the ground that he was drunk.)

(3)  Two questions and answers respecting his whereabouts on the night of October 24, i. e.,  "Q.  Where were you if you know, on the night of October 24th?  A.  I was home.  Q.  At home where? A.  1426 North Fourth, Quincy, Illinois."

(4)  The testimony of his wife to the effect that on the day in question appellant "come home I guess about six or six-thirty; came home and we had supper and he never left."  This witness further testified that between the two visits of the police appellant "told me he was going uptown to get a haircut, and I didn't see him any more."

I.  We agree with the assertion of the appellant that "the information in this case is based on Sec. 4070, R. S. 1929" (Sec. 4070, Mo. Stat. Ann., p. 2875), which, insofar as pertinent, provides: "If any person  .  .  .  shall willfully kill any such animal (the subject of larceny, being the property of another), with intent to steal or convert to his own use the carcass or skin or any part of the animal so killed, he shall be adjudged guilty of larceny and punished in the same manner as if he had feloniously stolen such animal."  The information after appropriately charging an offense based upon a violation of this section, also avers that the accused "did then and there feloniously steal, take and carry away the carcass of said hog."  The first point briefed is that the court erred in overruling a motion to quash the information, allegedly bad for duplicity, in that it charged not only the offense denounced by Section 4070, supra, but also the separate and distinct offense of larceny of the carcass.  No such point has been preserved, because neither the motion itself nor an exception to the ruling of the court thereon is set out in the bill of exceptions.  "It has been uniformly ruled by this court that the motion to quash an information or indictment, with the proper objections and exceptions to the ruling of the court upon such motion, must be preserved in the bill of exceptions, and, unless this is done, the sufficiency or insufficiency of the indictment or information cannot be considered by this court, unless it is fatally defective, and fails to charge any offense under the law."  [State v. Tooker, 188 Mo. 438, 87 S. W. 487; State v. Wooley, 215 Mo. 620, 115 S. W. 417; State v. Humfeld, 253 Mo. 340, 161 S. W. 735.]  We have considered the objections to the information which are open in the absence of a bill of exceptions, and as appellant in his brief expressly "concedes that all of the elements which constitute an offense under the statute are stated in the information," the additional allegation above pointed out becomes unimportant.  At most, it was mere surplusage, and, under Section 3563, Revised Statutes 1929 (Sec. 3563, Mo. Stat. Ann., p. 3160), it is provided that no information shall be deemed invalid "for any surplusage or repugnant allegation, when there is sufficient matter alleged to indicate the crime and person charged."  In this

situation we have no hesitancy in holding the information good after verdict.

■ II. Complaint is made with respect to the giving of two instructions on the part of the State, namely, Nos. 1 and 4. It is contended that they are conflicting and misleading. Instruction No. 1 requires that the jury shall find not only that at the time and place mentioned in the information the appellant killed the hog in question with the intent to steal and convert to his own use the carcass thereof, but that at said time and place he did also steal, take and carry away said carcass. Instruction No. 4 submitted the hypothesis of a conspiracy between Archie Thrasher and appellant, and authorized a conviction upon a finding that appellant "accompanied said Archie Thrasher and participated in the willful and felonious killing of said hog, with the felonious intent to convert all or any part of the same to his own use and deprive the owner thereof." The alleged conflict arises out of the fact that this instruction omits the requirement of Instruction No. 1 with respect to stealing, taking and carrying away the carcass itself. That feature of Instruction No. 1 was improper, because not one of the elements of the offense under the statute, supra. But it should be pointed out that Instruction A, given at the request of appellant, submitted the converse of Instruction No. 1, and included all of the elements mentioned in the latter, including the finding that appellant "did then and there feloniously steal, take and carry away the carcass of said hog, the property of said Charles O. Tarpein." The effect of the giving of instructions 1 and A was to place a greater burden on the State than that which the statute imposed. As this was distinctly favorable to appellant, he is in no position to complain on that score. [State v. Moore, 311 Mo. 531, 279 S. W. 134; State v. Futrell, 329 Mo. 961, 46 S. W. (2d) 588.] Instruction No. 4 fully and correctly declared the law, and embraced every element necessary for a conviction under the statute. Now, does the giving of such a correct instruction, on one theory, in conjunction with an instruction on another theory which latter instruction is erroneous, but only insofar as it requires proof on the part of the State in excess of that imposed by law, create such a material conflict as warrants this court in interfering? It is not pointed out or suggested how the alleged conflict could or might tend to confuse or mislead the jury to appellant's prejudice. Certainly in the circumstances here present, it cannot be said that these instructions misled the jury by inducing a verdict on less facts than the law requires. This being true, we regard the conflict as not sufficiently substantial or material to merit further discussion, and overrule the contention.

■ Instruction No. 8 is also challenged. But as the motion for new trial merely recites that it is "wholly erroneous," and does not assign any reason or reasons therefor, the point is not saved, because not in compliance with the statute governing motions for new trial in criminal cases. [Sec. 3735, R. S. 1929, Sec. 3735, Mo. Stat. Ann., p. 3275.]

■ III. We have examined the record proper and find it without reversible error. The verdict reads as follows: "We, the jury, find the defendant guilty and assess his punishment at two years in the penitentiary. Port P. Hall, Foreman." This form of verdict is good in cases where, as here, the information charges a single offense in one count. [State v. Gentry (Mo.), 55 S. W. (2d) 941; State v. Martin, 230 Mo. 680, 132 S. W. 595; State v. Stark, 202 Mo. 210, 100 S. W. 642.]

The judgment should be affirmed, and it is so ordered. All concur.